IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TRACY LEACH,
Plaintiff,

vs.

Case No. 04-1358-JTM

CONTINENTAL CASUALTY COMPANY,
Defendant.

MEMORANDUM AND ORDER

This is an action by plaintiff Tracy Leach challenging the denial of disability benefits under a group disability plan issued by his employer, Russell Stover Candies, Inc. The Administrator of the Plan, Continental Casualty Company, decided that Leach was not disabled as defined in the policy. The action is brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). Continental and Leach have both moved for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Continental administered a long-term disability insurance policy funding benefits for participants in the Russell Stover Candies, Inc. Group Disability Plan adopted by Russell Stover Candies, Inc. The Plan provided that Russell Stover would administer it through an insurance contract purchased from Continental. The Plan also stated: "The Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan." (Def. Exh. A, at 30). The front page of the Plan stated: "When making a benefit determination under the policy, We [Continental] have discretionary authority to determine Your eligibility for benefits and to interpret the terms and provisions of the policy." (Id. at 15).

The policy defined eligibility for coverage in the Summary of Benefits as follows:

**Eligibility:**

**Class 1** - all active full-time Employees with pre-disability earnings of $4,167 or more per month, including Corporate Officers and excluding Owners, who are Actively at Work for the Employer.
**Class 2** - all active full-time Salaried Employees including those with pre-disability earnings of $4,167 or more per month, who are Actively At Work for the Employer.
**Definition of full time**: Employees must be working at least 30 hours per week.

(Id. at 16).

The plaintiff's income exceeded $4,167.00 per month and he was thus in Class 1.

The Plan defined "Actively At Work" or "Active Work" to mean

the employee must be (1) working at the employer's usual place of business, or on assignment for the purpose of furthering the employer's business; and (2) performing the material and substantial duties of the insured employee's regular occupation on a full-time basis.

(Id. at 28).

Coverage terminated under the Plan when an employee was no longer a member of a class eligible for coverage:

**When will your insurance terminate?**
Your coverage will terminate at the earliest of the following dates:
1. The date the policy is terminated; or
2. The premium due date if the employer fails to pay the required premium for you, except for an inadvertent error; or
3. The date you:
   (a) are no longer a member of a class eligible for this insurance, or
   (b) withdraw from the program, or
   (c) are retired or pensioned, or
   (d) cease work because of a leave of absence, furlough, layoff, or temporary work stoppage due to a labor dispute, unless We and the Employer have agreed in writing in advance of the time to continue insurance during such period.

Termination will not effect a covered loss which began before the date of termination.

(Id. at 23).

The Plan defined Disability as follows:

**Disability** or **Disabled** means that you satisfied the Occupation Qualifier or the Earnings Qualifier as defined below.

**Occupation Qualifier**,
Class 1. "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity that you are:
1. continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and

2. not working for wages in any occupation for which you are or become qualified by education, training or experience.

Class 2. "Disability" means that during the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such a degree of severity that you are:

1. continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and
2. not working for wages in any occupation for which you are or become qualified by education, training or experience.

After the Monthly Benefit has been payable for 24 months, "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity that you are:

1. continuously unable to perform the Material and Substantial Duties of Any Occupation for which you are or become qualified by education, training or experience; and
2. not working for wages in any occupation for which you are or become qualified by education, training or experience.

**Earnings Qualifier.** You may be considered Disabled during and after the Elimination Period in any month in which you are Gainfully Employed, if an Injury or Sickness is causing physical or mental impairment to such a degree of severity that you are unable to earn more than 80% of your Monthly Earnings in any occupation for which you are or become qualified by education, training or experience. On each anniversary of your disability we will increase the Monthly Earnings by the lesser of the current annual percentage increase in CPI-W or 10%.

You are not considered to be Disabled if you earn more than 80% of your Monthly Earnings. Salary, wages, partnership or proprietorship draw, commissions, bonuses, or similar pay, and any other income you receive or are entitled to receive will be included. Sick pay and salary continuance payments will not be included. Any lump sum payment will be prorated based on the time over which it accrued or the period for which it was paid.

Material and substantial duties means the necessary functions of your regular occupation which cannot be reasonably omitted or altered.

(Id. at 17).

The Plan provided that any claims for disability were to be submitted to the Continental Casualty Company, CNA Home Office, CNA Plaza, Chicago, IL 60685, and must include specific proof of disability:

The following items, supplied at Your expense, must be a part of Your proof of loss. Failure to do so may delay, suspend or terminate Your benefits:

1. The date Your Disability began;

2. The cause of Your Disability;

3. The prognosis of Your Disability;

4. Proof that You are receiving Appropriate and Regular Care for Your condition from a Doctor, who is someone other than You or a member of Your immediate family, whose specialty or expertise is the most appropriate for Your disabling condition(s) according to Generally Accepted Medical Practice.

5. Objective medical findings which support Your Disability. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for Your disabling condition(s).

6. The extent of Your Disability, including restrictions and limitations which are preventing You from performing Your Regular Occupation.

7. Appropriate documentation of Your Monthly Earnings. If applicable, appropriate, regular monthly documentation of your Disability Earnings.

8. If You were contributing to the premium cost, Your employer must supply proof of Your appropriate payroll deductions.

9. The name and address of any Hospital or Health Care Facility where You have been treated for Your Disability.

10. If applicable, proof of incurred costs covered under other benefits included in the policy.

(Id. at 26).

Leach submitted an application for long-term disability benefits to Russell Stover, which forwarded the application to Continental on June 6, 2003. The application consisted of an Employer's Statement, Employee's Statement, and a Physician's Statement. (Def. Exh. B).

Russell Stover stated that Leach's last day at work was March 7, 2003; that he was a plant manager; that he was paid a salary of $8,433.33 per month for a 40-hour week; that he was not retired or terminated nor had he worked part-time or performed partial duties since his disability began; and that he was paid 100% of his salary through May 23, 2003 and 50% of his salary from May 24 through July 23, 2003. (Def. Exh. B at 632- 633).

Leach completed the long-term disability Employee's Statement, answering the question "How does sickness/injury prevent you from returning to work?" with a single word — "illness" — and supplying a list of twelve medical care providers beginning in the year 2000 through 2003. (Id. at. 633-634).

The Physician's Statement was completed by Leach's primary care physician, M. D. Sheern, a family practice doctor. Dr. Sheern generally outlined Leach's condition noting a diagnosis of "coronary artery disease; probable autoimmune process; and headaches, recurrent." Dr. Sheern stated that the symptoms of this were "chest pain, fatigue, extremity pain, headache." Dr. Sheern also stated that Leach was "unable to lift repeatedly, stand for extended periods of time, attend for a period of time to task without rest period." (Id. at 635 to 636).

Russell Stover submitted a completed Job Analysis Form describing specific job information. As Plant Manager, Leach was responsible for plant operations and management. The employer described Leach's work environment as follows:

> **Primary Work Site**: Inside 98%, Outside 2%.
> **Temperature factors**: extreme cold, extreme heat, extreme wet or humid conditions. non-existent Noise factor, vibration: non-existent.
> **Hazards**: Air quality factors: presence of some dust and some odors.
> **Working Surfaces**: Working surfaces are even, carpeted, flat/hard, dry, wet, cement.
> **Relationships with Co-workers**: Plant Manager works with a group.
> **Physical Requirements**: Mobility factors: Walk 100%. Climb 0%. Crawl 0%.
> **Primary Work Positions**: Stand 65%. Sit 35%. Crouch, kneel, prone 0%.
> **Specific Movements** (Rate: 1= Occasionally; 2= Frequently; 3= Constantly.)
> **Trunk**: Bend 1; Twist/Rotate 0; Push/Pull 0.
> **Carry**: 1; Number of pounds 10. Distance 0.
> **Arms**: Reach 1; Work with arms extended 1; Arms bent 1; no carrying
> **Lift from floor to waist**: 1; number of pounds 10.
> **Lift from waist to overhead**: 1; number of pounds 10.
> [All other work with arms such as carry, push/pull, twist/rotate horizontal are rated 0.]
> **Legs**: Lift 1; number of pounds 10. Balance, twist/rotate, push/pull 0.
> **Hands**: Gross dexterity 1; eye hand coordination 1; all other use of hands such as finger dexterity, grasp/manipulate, speed required, bi-lateral coordination, dominance, are all rated 0.
> **Physical Requirements Comments**: High stress environment; ability to react under pressure and meet production needs on daily basis.

(Id. at 607-609).

Leach also completed a Statement of Daily Activities containing the following:

> **Question**: How does your function [sic] keep you from performing your job duties?
> **Answer**: Frequent fatigue-pain. Unable to give direction and leadership as needed. Can only work in production area for short periods without pain and constant fatigue. Sleep is the only thing that has reduced pain in head. Muscle fatigue along with pain. Angina-chest pain from heart disease.

(Id. at 503-508).

On October 22, 2003, Dr. Sheern completed a Functional Assessment Tool form stating that

> Not able to perform extended [illegible] walking, standing required due to advancing symptoms.
>
> Treatment plan [illegible] evaluation in area of rheumatology, continued treatment of cardiac diseases.
>
> Limited in lifting, standing, ambulatory extended times distances. Time of limitations unable to determine.

(Tr. 458).

On December 19, 2003, Continental issued its letter denying long-term disability benefits based upon the policy, its physician consultant's review of the submitted application, medical records, and telephone interview with Dr. Sheern. After stating and quoting the terms of the policy upon which the denial was based, the letter of denial stated as follows:

> A review of Dr. Sheern's medical records through 9/23/03 indicates that on 3/10/03, three days after you stopped working you were seen with complaints of multiple symptoms including fatigue, sharp pain episodes in upper extremities, headaches, intermittent chest pain and sleep difficulties. The physical exam on this date showed no abnormalities, including neurological, except for a slight decrease in vibratory sensation of the lower extremities. A number of laboratory tests were ordered and you were given prescription to treat the possibility of chronic sinusitis. When seen on 3/21/03 your symptomology was discussed, laboratory studies were reviewed and other than weight and blood pressure there was no report of physical exam findings. Progress notes of 4/3/03 and 5/1/03 reports your physical examination, including neurological testing, gait and balance, were all normal as was the cardiac exam. Repeat laboratory testing on 5/5/03 revealed normal CBC, sedimentation rate and elevated INR, which would be consistent with Coumadin therapy. An ANA was negative.
> After 5/5/03, you were not seen again until 7/1/03 by Dr. Swanson and by Dr. Sheern on 7/29/03 for rectal bleeding. The 8/19/03 visit with Dr. Sheern, you stated that your extremity pain was better, but still had diffuse pain symptoms and difficulty sleeping. You also stated that you had no weakness of the extremities or chest pain. The rectal bleeding had resolved and the Protime/INR was therapeutic. Office visit followed on 9/16/03 for biopsy of finger nodules with findings consistent of warty skin lesion, not a rheumatoid nodule. When seen on 9/23/03 it is noted that the biopsy site was healing well and the pathological results were discussed. Additional laboratory testing on that date included RA titer, which was negative.
>
> The Functional Assessment Tool form dated 10/22/03 by Dr. Sheern indicates "unable to perform extended day at work with walking, standing required due to advancing symptoms. Limited in lifting, standing, ambulating for extended period of time or distances."

The claimant interview conducted with you on 8/11/03 indicated that you are able to care for your own personal needs, preparing own meals, shopping, visit friends, going to movie, yard work and trying to walk two miles a day. You also completed a 14-day activity log between 9/24/03 and 10/7/03. You described activities such as driving a truck, taking out the garbage, running various errands away from your home, visiting relatives, watch TV, cleaning the garage and walking. In a statement of daily activities dated 10/8/03 it is indicated that you shop for groceries, shop at other stores, drive a motor vehicle, use the telephone and watch television.

The physician consultant indicated that the information provided in the medical records submitted and reviewed indicate that the restrictions given by Dr. Sheern are based on your symptoms and not on specific medical findings. Based on the review of medical records it appears that the intense investigation of your multiple symptoms since 3/03 has not yielded a definitive explanation and the physician consultant do [sic] not see any findings on physical and laboratory examination which would lead to recommendation for particular occupational restrictions. The physician consultant noted that your neurological examinations have repeatedly failed to demonstrate consistent neurological deficits, ataxia or gait abnormalities. Additionally, there are no records available for the period of 5/5/03 and 7/1/03 which would be too long to assess what your functional status was, in relation to a continuous impairment.

The physician consultant contacted Dr. Sheern to obtain additional information regarding your functional status. The extent of the review of records from his office dated through 9/3/03 as well as records from Drs. Swanson, Brown and Steuwe, was explained. He also mentioned the various surveys of activities of daily living, indicating that you were engaging in sedentary and light activities at home. **The physician consultant asked Dr. Sheern what findings, if any, would support occupational restrictions as [it] seemed from reviewing the records that work limitations were mostly assigned based on your various symptoms. Dr. Sheern acknowledged that this was essentially the case so far. Dr. Sheern admitted that there had been no physical signs of impairment such as neurological deficits, musculoskeletal abnormalities or synovitis, only laboratory abnormalities such as positive IgA antiphospholipid antibody**. He mentioned that you were recently evaluated by Dr. Gardner but did not have the record directly in front of him. Dr. Sheern was also asked if you had been seen or if there were any medical records for the time period from 5/5/03 to 7/1/03 but he could not directly recall.

Disability determinations are based upon the information presented to support a functional loss or impairment that would continuously prevent you from performing the substantial and material duties of your occupation. We acknowledge that you are receiving treatment, however, testing, treatment, diagnosis and management of a medical condition do not confirm an inability to perform your occupation or indicate a disabling impairment.

In conclusion, there is no documented medical information to support the physical limitations indicated by Dr. Sheern. Based on the information available for review and physician contact with Dr. Sheern the information presented does not support impairment in function that would have precluded you from performing the substantial and material duties of your occupation as of 3/10/03. Therefore, no benefits are payable. Furthermore, your coverage would have ended if you did not

> return to work full time and any loss, which begins after your coverage terminates, will not be considered.

(Def. Exh. C, at 437-439) (emphasis added).

On January 30, 2004, counsel for Leach requested the administrative record from Continental. Continental supplied the full claim file including claim notes and a copy of the policy on March 5, 2004.

On June 11, 2004, Leach appealed the denial of long-term disability benefits. The appeal was accompanied by additional medical records and the Social Security Administration's notification that Leach's disability benefits would be granted dating back to March 10, 2003.

On June 18, 2004, the medical records were submitted to Dr. Eugene Truchelut, M.D., who had previously reviewed medical records prior to the original denial. His report on the additional medical records states in part:

> To summarize, this is a 51-year old man whose last date of work was over a year ago and who has had established diagnoses of coronary artery disease treated by surgical and angioplastic means, localized bladder carcinoma, pulmonary embolism, cephalgia and a hypercoaguable state, which has not been easy to define.
> To respond to your specific questions: **The additional information provided does not contain reports of physical, laboratory or radiological findings which would support on a continuous basis the broad restrictions provided in the functional assessment tool** (FAT of 10/22/03). As I noted before, these limitations were based on the claimant's chronic symptoms as reported to Dr. Sheern. **The claimant's diagnosis per se would not lead to any specific reduction in functional capacity with the exception that I gave on 11/30/03 that the chronic use of Coumadin would create a problem for hazardous workplace exposures. The more recent records have not indicated that claimant's cardiac problems have become unstable, required additional treatment or evaluation, or have led to specific restrictions, although I am inclined to think that heavy exertion, isometric loading should be avoided.** There are two areas of information-void problem 4/04 to the present time, and the two months from early May to early July of 2003 which I discussed in my first report. My impression regarding the latter has not changed.

(Def. Exh. D at 56-59, 63-64) (emphasis added).

Dr. Truchelut had previously written, as to Leach's use of Coumadin,

> I do not see any findings on physical or laboratory examination which would lead to recommendations for particular occupational restrictions with the exception that a subject who is taking Coumadin will need to be careful in certain hazardous workplace environments where lacerations, etc., could occur.

Def. Exh. C. at 463).

On July 22, 2004, Continental Casualty referred Leach's disability claim appeal plus all medical records, including those furnished by Leach as part of his appeal, to the University Disability Consortium Medical Consultant Program. The Medical Consultant Program was instructed by Continental to contact Leach's family practice physician, Dr. Sheern, plus two additional specialists, Dr. Farha (urology) and Dr. Bajaj (cardiology). Continental attached to the Medical Consultant Program referral form the Case Summary and a list of questions to be answered by the second medical consultant, Dr. Mark Friedman, M.D., Board Certified in Internal Medicine:

> 1. Does [sic] the records support advanced heart disease that would cause limited lifting, walking, standing and lifting.
>
> 2. If so, what would the restrictions and limitations be for his cardiac condition? Is there an METs level that would provide a physical functional level?
>
> 3. Does the urinary gross hematuria cause a functional impairment of the claimant as of the claimant's last day worked forward?
>
> 4. What would the restrictions and limitations be from a urology standpoint and would there be duration of time if there are restrictions.
>
> 5. Based on all of the information, what are the claimant's restrictions and limitations and duration of time if any?
>
> 6. Explain probable antiphospholipid antibody syndrome and would that effects of this condition explain the claimant's symptoms?

(Def. Exh D. at 63-64).

On August 9, 2004, Dr. Friedman submitted his Medical Record Review to Continental. He had previously contacted the three physicians — Drs. Bajaj, Farha, and Dr. Sheern — before making his conclusions. After a lengthy and detailed analysis of all submitted medical records from 1996 to 2004, he responded to the above questions as follows:

> **RESPONSE TO REFERRAL QUESTIONS:**
>
> 1. The records do not support advanced heart disease that would limit walking, standing and light lifting activities as of the time of his disability onset in March 2003 and subsequently, there is no objective evidence offered of a change in his cardiac status and based on his history of coronary artery bypass grafting and known prior coronary artery disease, a lifting restriction of 25 pounds on a

repetitive basis would be reasonable. There would be no restrictions on walking, standing, sitting, and activities consistent with a sedentary to light DOL (Department of Labor) position.

2. There is no stress testing carried out during the period of time of his disability onset and following it and therefore, there is no indication of objective findings of CAD (coronary artery disease). I cannot comment on his METS in the absence of an exercise stress test. Based on the clinical notes I would state his restrictions from a cardiac viewpoint as stated in number one.

3. The gross hematuria noted in March 2004 did not cause a functional impairment as of his last day of work forward. The hematuria was due to a transient factor related to a small bladder tumor and anticoagulation. The anticoagulation would be functionally limiting with regard to climbing heights, hazardous occupations involving operating dangerous equipment, climbing ladders, etc. It would not impair him from sedentary to light activities.

4. No restrictions from a urology point of view other than those noted related to Coumadin would be appropriate. These are described in number three.

5. Based on all the information available from the medical records his restrictions and limitations would permit a sedentary to light occupation as of March 2003. There is no indication in these records of any significance to the APA (autoimmune phospholipid antibodies) levels, no indication of change in his neurologic status, or cardiac status. While references to arthralgias, fatigue, sleep disturbance, etc. are made, no functional findings are noted. The significance of these symptoms are unknown and autoimmune disorder has not been diagnosed that would account for this much less any other significant physical condition. The possibility of a psychiatric condition is not examined in these records.

6. The APA antibody findings would not explain his symptoms per se. APA may be found with a number of clinical conditions, which may cause functional limitations include lupus (SLE) and other rheumatologic conditions. The finding of an antibody itself is not functionally limiting. It is only the effects of the antibody or an underlying disease which may be limiting. There is no evidence presented in these records of a rheumatologic disease or other condition which is functionally limiting other than the arthralgias (joint pains) of his wrists and hands. These per se would not prevent a sedentary to light occupation. In summary, the APA antibody does not explain his symptoms nor does it explain any functional limitations.

(Exh. D at 41-53).

On August 12, 2004, defendant sent its letter affirming denial of Leach's long-term disability benefits as stated in its initial denial. The letter stated that extensive Mayo Clinic and Cleveland Clinic evaluations of Leach's cardiac, neurological and endocrine systems plus a rheumatologic evaluation in 2000 found no significant objective functional or clinical limitations and concluded as follows:

> Based on the medical records and discussing your client's condition with Dr. Sheern, Dr. Friedman concluded that the records provided do not suggest any change in his cardiac status around the time of his disability in March 2003 or going forward. Specifically, no evidence of angina symptoms, abnormal stress testing, etc. which would suggest a change in his cardiac status, is noted. As of that time, there was no functional limitation with regard to a sedentary to light occupation. While this laboratory finding is of possible significance, there is little to suggest any correlation with his specific symptoms, nor of a clinical disease being present due to (autoimmune phospholipid) antibodies.
> We are not disputing that your client has a history of cardiac disease and multiple symptoms; however, the medical evidence presented does not show a change in your client's cardiac status that would prevent him from performing his occupation. We also realize that your client complained of multiple neurological and rheumatologic symptoms; however, while there were some abnormal diagnostic results, your client's own physician stated that these were of unclear significance and no abnormal neurological clinical findings were found on examination. We also relied on the expertise of the medical consultant who concluded that the evidence presented did not support any restrictions and limitations less than a sedentary or light position. This evidence does not support a continuous functional impairment that would prevent your client from working at his occupation.

(Def. Exh. E, at 39-40).

Russell Stover, Administrator of the Plan, was also informed of the denial on appeal of benefits to Tracy Leach. (Exhibit E, Final Determination on Appeal p. 37).

In response to Continental's motion for summary judgment, plaintiff has submitted details of his medical background, which are not controverted. These facts establish that Leach underwent a left heart catheterization consisting of angioplasty and stent placement on July 13, 1999 at Wesley Medical Center. Three months later, while living in Texas, Leach presented to Baylor University Medical Center complaining of chest pain. October 13, 1999, Brent Glamann, M.D. performed a left ventricular angiography, a left heart catheterization, a coronary angioplasty and coronary balloon angioplasty. A total of six stents were placed at that time.

Six months later, on April 30, 2000, Leach presented to Wesley Medical Center complaining of chest pain. The cardiologist, Ashok K. Bajaj, M.D., itemized a "problem list" as follows:

> 1. Chest pain consistent with myocardial ischemia, although no objective data is noted.
> 2. History of ischemic heart disease with multiple stent placements here and at Texas.
> 3. Negative workup at Mayo Clinic recently for cardiac disease, for his back.
> 4. Minimal hypertension.

5. Mild hyperlipidemia.

(Tr. 174).

On May 2, 2000, Dr. Bajaj performed left heart catheterization and coronary angiograms. Following these procedures, he stated there was "[s]ignificant two-vessel (right coronary artery, left circumflex) obstructive coronary artery disease," and concluded, "I suspect, given his recurrent restenosis of the right coronary artery, that potentially the best course here is to proceed with coronary artery bypass surgery, with bypasses to the right coronary artery and the left circumflex two marginal branches." (Tr. 229). Dr. Bajaj consulted Robert H. Fleming, M.D., who issued a report dated May 3, 2000, which observed that"Dr. Bajaj had repeated his cardiac catheterization and found two vessel coronary artery disease, and a "total occlusion of the right coronary." (Tr. 176). An MRI of the chest taken that same day revealed "No acute cardiopulmonary disease." (Tr. 194)

On May 5, 2000, two days after the MRI results and his consultative report, Dr. Fleming performed a double coronary artery bypass grafting.

23. On May 23, 2000, Leach presented to Wesley Medical Center complaining of pain and swelling in his legs. The following day, Leach was again admitted to Wesley Medical Center complaining of chest pain. On that day, Dr. Bajaj performed bilateral pulmonary angiograms, and concluded, "Normal, bilateral angiograms." (Tr. 132).

About three weeks later, on June 14, 2000, Leach was again admitted to Wesley for chest pain ("accelerating angina pectoris"). (Tr. 149). A cardiac catheterization was performed that day. The following day, June 15, 2000, Dr. Bajaj successfully performed a coronary angioplasty and inserted a stent in the left circumflex coronary. Dr. Bajaj stated "We then turned our attention to the right coronary artery. . . .Despite multiple wires . . . we were unable to fully cross the occlusion. . . . Further attempts were made, but again without success." (Id.). He concluded that there was an "[u]nsuccessful percutaneous transluminal coronary angioplasty of chronically occluded right coronary artery." (Tr. 150).

On June 16, 2000, Leach was discharged with the following final diagnoses:

**FINAL DIAGNOSES:**
1. Atherosclerotic cardiovascular disease.
    A. Accelerating angina.
    B. Positive stress echocardiogram.
    C. Significant coronary artery disease.
    D. Hyperlipidemia.
    E. Borderline hyperstension.
    F. Status post two-vessel coronary bypass surgery, May 2000.
    G. History of atrial fibrillation ([post-op] from his bypass surgery.)
    H. History of pulmonary embolism.

(Tr. 220).

28. One year later, on July 12, 2001, an MRI of the chest revealed, "No evidence of active disease in the chest." (Tr. 121). Nonetheless, Charles W. Beck, M.D. performed a left heart catheterization and coronary arteriography that day, the latter of which found the "circumflex and marginal branch occluded but the vein to the circumflex is widely patent" and that "[t]here are stents in the right but the right is totally occluded and the vein graft to the right is occluded." (Tr. 120).

Leach presented to Dr. Beck on June 19, 2001, who noted the past history of nine cardiac catheterizations and 12 to 13 stent placements. Leach again presented to Dr. Beck on August 24, 2001 "still having dizzy episodes, several a day." (Tr. 126). He also reported chest pain, and taking four nitroglycerin tablets daily.

On August 8, 2002, Leach presented to Michelle R. Brown, M.D., "for evaluation with a new cardiologist." (Tr. 487). Leach complained of "weight changes, weakness, fatigue, chest pain, shortness of air, palpitations, dizziness, and cough." (Tr. 488). He complained of numbness in his hands, legs, and head. Dr. Brown noted the past history of "Ten heart catheterizations and angioplasties and coronary artery bypass grafting." (Tr. 487) . However, the physical examination was unremarkable.

Dr. Brown saw Leach a second time on October 1, 2002 when Leach complained of "increasing fatigue and states he has chest pains both at rest and with exertion." (Tr. 483). Leach

also reported additional headaches and dizziness. Again, the physical examination was unremarkable. (Tr. 484).

Brad R. Stuewe, M.D., a nephrologist, wrote Dr. Scheern on February 5, 2002, and stated:

> Measured multiple different ways, there is nothing I can document in this circumstance that shows any evidence of a hypercoagulable state.
>
> Nonetheless, this man clearly is hypercoagulable. The nature of his lesion escapes multiple investigations. Nonetheless, I would take the rather nihilistic approach of just going ahead and anticoagulating him. Adding Coumadin to his aspirin, I think is very appropriate.
>
> I discussed this with both Dr. Beck, a hematologist here, as well as Dr. Mikinski [a cardiologist], who both agree with that approach in this circumstance.
>
> I am sorry that the nature of his clotting abnormality is unknown, nonetheless, is [sic] seems inconceivable to me with this dramatic of history that this is not the nature of his problem. Also given the history that he has rapid "re-stenosis" occurring within weeks after previous stent, is diagnostic of hypercoagulable state as well.

(Tr. 356).

In his last treatment note, dated August 28, 2003, Dr. Suewe diagnosed anitphospholipid syndrome, and "unusual peripheral neurologic symptomatology, etiology undetermined." (Tr. 562).

**Conclusions of Law**

The question before the court is whether the defendant acted illegally in denying Leach's claim for disability benefits. Here, Leach argues that Continental's judgment was inherently subject to a conflict of interest, that Continental was unreasonable in failing to acknowledge that "*something*" caused the recurrent clotting problems (Dkt. No. 20, at 17), that there was "no requirement that the cause of the hypercoagulabilitiy" be proved scientifically, that Continental unreasonably ignored his history of cardiac disease, and that Continental unreasonably refused to order an independent medical evaluation.

Ordinarily in such cases, the court applies an "arbitrary and capricious" standard of review to the administrator's actions. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L.Ed. 2d 80 (1989). However, because of the conflict of interest existing when an administrator also functions as the funding source of the benefit plan, a modification to the standard deferential approach is required. *Firestone*, 489 U.S. at 115. In such cases, a sliding scale of reasonableness is applied, and the administrator must demonstrate that its interpretation of the plan was reasonable and that its application of the plan terms to the claimant is supported by substantial evidence. *Fought v. UNUM Life Insurance Company*, 379 F. 3d 997 (10th Cir. 2004). In *Wolberg v. AT&T Broadband Pension Plan*, 2005 U.S. App. LEXIS 197 at p. 15 (10th Cir. 2005), the Tenth Circuit noted that "the sliding scale approach and the factors to be established by the plaintiff to show a conflict of interest have been the law of this circuit for many years." Under an arbitrary and capricious standard, the decision of the Administrator is upheld if it was grounded on a reasonable basis, and that basis "need not be the only logical one nor even the best one." *Nance v. Sun Life Assurance Company of Canada*, 294 F. 3d 1263, 1269 (10th Cir. 2002). Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion." *Sandoval v. Aetna Life & Casualty Ins. Co.,* 967 F. 2d 377, 382 (10th Cir. 1992).

The plaintiff here continued to work as a plant manager after numerous medical treatments for a variety of ailments, including the coronary problems cited above. On March 7, 2003, he terminated his employment and has not returned to work. The defendant's desire to find objective medical evidence for why Leach became disabled at that time was not unreasonable, since the plan only provided coverage of conditions which were disabling while the worker was covered under the Plan. *Cf. De Connick v. Provident Life & Accid. Ins. Co.*, 747 F. Supp. 627 (D. Kan. 1990). Here, the evidence in the record does not show that, on or before March 7, 2003, Leach was disabled from performing his job duties. The court finds that substantial evidence supports the decision of the defendant.

Leach visited Dr. Sheern shortly after he left work, but the records of the visit show no objective evidence of disability. The physical tests then and in follow-up visits were normal. The records from Dr. Sheern fail to provide any objective medical data showing the existence of a disability within any time prior to the 90-day elimination period. However lengthy and voluminous the plaintiff's medical records may be, they do not contain objective findings supporting the conclusion that Leach was disabled at the relevant time. The records do not show any limitation on Leach's ability to work; his conditions, while chronic, have not been shown to be disabling.

It was not unreasonable for defendant to give limited weight to the opinions of Dr. Stuewe that Leach was "clearly" hypercoaguable, when in the very same report Dr. Stuewe observed that he could not identify "any evidence of a hypercoaguable state." The function of the court is not to reassess the weight which ought to have been accorded various medical authorities, but to determine whether the plan administrator's assessment of those authorities was reasonable and grounded on substantial evidence.

The court also finds that Continental's investigation into Leach's claim was not unreasonable. The administrator is not required to credit the opinion of a treating physician. *Black & Decker v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L.Ed. 2d 1034 (2003). Here Continental submitted plaintiff's claim to two independent medical examinations, and two board-certified internists concluded that plaintiff was not disabled. The court finds the review procedure used by Continental was reasonable and provided substantial evidence to support the denial of the claim.

Plaintiff suggests that the defendant should have authorized an independent and direct physical examination. But the court finds no authority which would support such an obligation, and much authority to the contrary. *See, e.g., Donatiello v Hartford Accident Ins.*, 344 Fsupp.2d 575 (E.D. Mich. 2004). In *Fought*, the Tenth Circuit agreed that independent medical examinations "are often helpful," but also attached the explicit caveat that they are "not required." 379 F3d at 1015. The defendant here followed the procedures outlined in 29 C.F.R. § 2560.503-1(h) contemplating

the use of independent medical review, and the court is without authority to supplement the Plan with additional procedures, such as imposing the requirement of an independent physical examination. The burden of proof as to disability remained with plaintiff, and the evidence in the record does not show that this burden was ever met.

The court finds no basis under the uncontroverted facts for concluding that either Continental's procedures or its ultimate decision were unreasonable. No basis exists for holding that the conclusion of the defendant denying coverage was based on less than substantial evidence.

IT IS ACCORDINGLY ORDERED this 2d day of February, 2006, that plaintiff's Motion for Summary Judgment (Dkt. No. 19) is denied; defendant's Motion for Summary Judgment (Dkt. No. 17) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE